OPINION
{¶ 1} Defendant-appellant Jonathan Dean Anderson appeals his conviction entered by the Stark County Court of Common Pleas, on one count of aggravated murder and one count of aggravated arson, following a jury's verdict. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On April 17, 2003, the Stark County Grand Jury indicted appellant on one count of aggravated arson, in violation of R.C.2909.02(A)(1), and one count of aggravated murder, in violation of R.C. 2903.01(A). The murder count carried a death penalty specification. Appellant appeared for arraignment on April 28, 2003, at which time he entered a plea of not guilty to the charges. The trial court ordered appellant held without bond.
 {¶ 3} Appellant filed numerous pretrial motions, including a motion to suppress, in which appellant asked the trial court to suppress any and all statements made by him to law enforcement officers and arson investigators on or about December 23, 2002, and on or about March 19, 2003. Appellant asserted he did not fully understand and/or appreciate his legal rights; therefore, could not knowingly surrender or waive those rights. The trial court conducted a hearing on the motion on July 30, 2003. The trial court overruled appellant's motion to suppress, and the matter proceeded to jury trial on September 4, 2003.
 {¶ 4} The following evidence was adduced at the suppression hearing and at trial.
 {¶ 5} At approximately 2:10 a.m. on December 11, 2002, Jake Reed was sitting on the couch in the living room of his duplex at 414 Water Ave., NW, in Massillon, Ohio, when he heard the sound of breaking glass. Reed looked out the window and observed four people standing in front of a stop sign. He watched them for two or three minutes, then readied himself for bed. As Reed proceeded to his bedroom, he heard more glass breaking and saw flames. Reed grabbed his shoes and some clothes, and ran outside. He saw the four people standing on the corner. He recognized them as his neighbors, Vicki Anderson; her daughter, Crystal; Donald Starcher; and appellant, Vicki's son. Reed noticed no particular reaction from any of his neighbors, and noticed they were dressed in street clothes, coats and scarves.
 {¶ 6} Scott Negulici of the Massillon Fire Department testified his station received a call at 2:25 a.m. on December 11, 2002, reporting a fire at 417 Water Avenue NW, the Anderson residence. Firefighters arrived at the scene shortly before 2:30 a.m., and found smoke coming from the first floor, and smoke and fire coming from the second floor of the two story house. Negulici recalled residents of the engulfed building, who were fully clothed and wearing winter coats, showed no emotions when they learned about the death of Dean Anderson in the fire. Firefighters searched the house three times before discovering the body of Dean Anderson. The coroner determined the cause of Dean Anderson's death to be thermal burns, smoke inhalation, and carbon monoxide poisoning.
 {¶ 7} After firefighters labeled the fire "suspicious," Capt. Jerry Layne was called to conduct an arson investigation. Capt. Layne arrived at the scene at approximately 3:30 a.m. on December 11, 2002. As part of his initial investigation, Layne spoke with the family members at the scene, who told him the electricity at the home had been shut off that day, and an oil lamp was being used in the kitchen for light. The family suspected the dog had knocked over the lamp. Although Layne determined the fire had started in the kitchen, he could not determine its origin. Layne returned to the home on December 18, 2002, with several Massillon detectives assigned to investigate the case and a fire investigator hired by the insurance company. Vicki Anderson was present at the time and provided written consent to search the home. During this search, the investigators found a blanket stuffed under the top of the stove. Based upon this subsequent investigation, the fire was ruled an arson.
 {¶ 8} Det. James Mizeres of the Massillon Police Department led the investigation of the case. On December 23, 2002, Det. Mizeres interviewed Vicki Anderson, Crystal Anderson Starcher, Donald Starcher, and appellant. After questioning appellant for approximately one half hour, Mizeres read appellant his Miranda warnings Appellant waived his rights, both orally and in writing. Det. Mizeres and Capt. Layne spoke with appellant for approximately two hours. At the end of the interview, appellant was released and left the station with his mother and sister.
 {¶ 9} During the course of his investigation, Det. Mizeres received telephone calls from James Welch and Michele Kourouniotis, individuals who knew Dean Anderson. Upon hearing of Dean's death, James Welch, the manager of the Camelot Carwash where Dean worked, called Det. Mizeres regarding a conversation he had had with Dean on December 10, 2002. Welch recalled Dean expressed fears of things that had happened at his home. Dean specifically told Welch he believed his family was trying to kill him.
 {¶ 10} When Michele Kourouniotis, a barmaid at Miller's Tavern, learned of Dean's death, she called Det. Mizeres regarding a conversation she had had with Dean on December 10, 2002. Kourouniotis had known Dean for approximately three years as a regular customer at the tavern. She recalled Dean telling her if anything happened to him to please have it investigated. Dean further told her he thought his family was trying to kill him.
 {¶ 11} After several months of investigation, Det. Mizeres determined he had enough evidence with which to conduct more thorough interviews with the Anderson family. Detectives interviewed Vicki Anderson, Crystal Anderson, and Donald Starcher, who had arrived at the Massillon Police Department together, on March 19, 2003. Later that day, Det. Mizeres sent Det. Nevada Gump to the Anderson residence to bring appellant in for an interview. Appellant willing complied with Det. Grump's request to go to the station. The detective transported appellant in the front seat of an unmarked vehicle. Once at the department, Det. Gump placed appellant in an unsecured computer room. Prior to conducting his interview of appellant, Det. Gump read appellant his Miranda rights. Appellant signed a written waiver of those rights.
 {¶ 12} During the course of the interview, appellant admitted his involvement in the fire, but denied being the only person responsible. Appellant proceeded to detail the plan "to get rid of" his father. Appellant stated he poured lamp oil along the back wall and back door of the first floor of the residence, and then ignited the oil. Upon completion of the oral interview, Det. Gump asked appellant if he would provide a tape recorded statement, to which appellant agreed. Det. Gump again read appellant his Miranda rights and appellant signed a written waiver of those rights. Appellant provided a taped statement to Det. Grump and, thereafter, was arrested.
 {¶ 13} After hearing all the evidence and deliberations, the jury found appellant guilty of all the charges and the specification set forth in the indictment. Following the mitigation proceedings, the jury recommended a sentence of life with parole eligibility after twenty-five years for the offense of aggravated murder and the attendant specification. The trial court sentenced appellant according to the jury's recommendation, and further imposed a ten year term of imprisonment for the offense of aggravated arson. The trial court ordered the terms be served concurrently.
 {¶ 14} It is from these convictions appellant appeals, raising the following assignments of error:
 {¶ 15} "The trial court abused its discretion and committed prejudicial error by admitting hearsay testimony as substantive evidence in the state's case in chief.
 {¶ 16} "II. The trial court erred in finding that appellant knowingly and intelligently waived his right against self-incrimination and overruling appellant's motion to suppress."
 II {¶ 17} For ease of discussion, we shall address appellant's second assignment of error first. Appellant maintains the trial court erred in finding he knowingly and intelligently waived his right against self-incrimination, and in overruling his motion to suppress.
 {¶ 18} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See: State v. Fanning (1982), 1 Ohio St.3d 19;State v. Klein (1991), 73 Ohio App.3d 486; State v. Guysinger
(1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See:State v. Williams (1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry
(1994), 95 Ohio App.3d 93, 96; State v. Claytor (1993),85 Ohio App.3d 623, 627; and State v. Guysinger, supra. As the United States Supreme Court held in Ornelas v. U.S. (1996),517 U.S. 690, 116 S.Ct. 1657, 134 L.E2d 911" . . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
 {¶ 19} In Miranda v. Arizona (1966), 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694, the United States Supreme Court held a suspect must be notified of his/her constitutional rights to remain silent and to have counsel present during a custodial interrogation by the police. Before the interrogation can begin, the suspect must make a knowing, intelligent, and voluntary waiver of those rights. If these procedural safeguards are not complied with, the confession may not be admitted at trial as evidence against the accused. According to Miranda at 444:
 {¶ 20} "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
 {¶ 21} In addition, a suspect's decision to waive his rights "is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." State v. Dailey (1990),53 Ohio St.3d 88, paragraph two of the syllabus, following Coloradov. Spring (1987), 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954. In determining voluntariness, we must look at the totality of the circumstances as set forth by the Supreme Court of Ohio in Statev. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus:
 {¶ 22} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including, the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."
 {¶ 23} Herein, appellant submits Det. Gump's failure "to engage in a meaningful dialogue" with appellant after he told the detective he did not understand what it meant to "waive" his rights rendered his waiver invalid. On March 19, 2003, Det. Gump conducted an oral interview of appellant at the Massillon Police Department. Prior to conducting the interview, the detective read appellant his Miranda rights and appellant signed a written waiver of those rights. That interview lasted approximately forty-five minutes. Thereafter, Det. Gump asked appellant if would provide a tape recorded statement, to which appellant agreed. Again, the detective read appellant his Miranda rights. During this conversation, appellant informed the detective he did not completely understand what it meant to "waive" his rights. Det. Gump testified at trial and at the suppression hearing he specifically explained the meaning of each individual right. Thereafter, when the detective asked appellant if appellant wished to waive his rights he responded, "Is it to give them up?" Det. Gump answered, "Yes," and appellant expressed his intention to waive his rights. Tr. of Suppression Hearing at 35. Det. Gump further noted appellant did not respond inappropriately to any of his questions.
 {¶ 24} Appellant voluntarily accompanied Det. Gump to the police station, was given Miranda warnings twice, and twice signed waiver forms attesting to the voluntariness of his statement belies any assertion his waiver was neither knowingly nor intelligently made. Under the totality of the circumstances, we find appellant's waiver was knowingly and intelligently made; therefore, his confession was voluntary. Accordingly, we find the trial court did not err in overruling appellant's motion to suppress.
 {¶ 25} Appellant's second assignment of error is overruled.
 I {¶ 26} In his first assignment of error, appellant contends the trial court erred and abused its discretion in admitting the testimony of James Welch and Michele Kourouniotis in the State's case-in-chief. Specifically, appellant challenges the trial court's determination the testimony fell within the "state of mind" hearsay exception set forth in Evid. R. 803(3), which provides:
 {¶ 27} "(3) A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."
 {¶ 28} In State v. Apanovitch (1987), 33 Ohio St.3d 19, the Ohio Supreme Court held evidence a victim had a fearful state of mind was admissible as a hearsay exception under Evid. R. 803(3) as a statement of "then existing state of mind, emotion, sensation or physical condition." The Apanovitch Court explained:
 {¶ 29} "In United States v. Cohen (C.A. 5, 1980),631 F.2d 1223, the defendant offered the testimony of state-of-mind witnesses to demonstrate that he acted out of fear of his codefendants. In discussing Fed.Evid.R. 803(3), the court noted that the rule permitted the witnesses to relate any out-of-court statements Cohen had made to the effect that he was scared, anxious, or in any other state reflecting his then existing mental or emotional condition. However, the court also observed that the state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. Accordingly, the witnesses were allowed to offer testimony that Cohen said, `I'm scared,' but not `I'm scared because Galkin threatened me.' Cohen, supra, at 1225. (Footnote omitted).
 {¶ 30} "Evid.R. 803(3) operates as a vehicle for the admission of a statement such as, "I am afraid of X." 1 Weissenberger, Ohio Evid. (1985), Chapter 801 at 42, Section 803.32. Accord McCormick, Evidence (3 Ed. 1984) 853, Section 296. The critical requirement is the statement refer to a present and not a past condition. Giannelli, Ohio Evidence Manual (1982), Article VIII at 36, Section 803.07. Where the statement does not relate to a "then existing" condition, it must be viewed as a narrative account formulated after time for reflection, and therefore it is not admissible under Evid.R. 803(3). Weissenberger, supra, at 40, Section 803.30.
 {¶ 31} "Finally, the testimony sought to be introduced must point towards the future rather than the past. When the state of mind is relevant it may be proved by contemporaneous declarations of feeling or intent. Shepard v. United States (1933),290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196."
 {¶ 32} We shall review the testimony at issue under theApanovitch guideline. James Welch, who worked with Dean Anderson, testified regarding a conversation he had with the decedent on December 10, 2002. Upon learning of Dean's death, Welch contacted the Massillon Police Department. His direct examination proceeded as follows:
 {¶ 33} "Q. As a result of that conversation, what did you learn was the condition of Ernest Dean Anderson?
 {¶ 34} "A. We learned that Dean Anderson had died in the fire that early morning.
 {¶ 35} "Q. Now, on December 18 did you have an occasion to talk to Detective Jimmy Mizeres?
 {¶ 36} "A. Yes, I did.
 {¶ 37} "Q. What prompted you to call Mr. Mizeres?
 {¶ 38} "A. The conversations that Dean and I had had.
 {¶ 39} "Q. Okay. Had Dean expressed any fear in those conversations?
 {¶ 40} MR. MACKEY: Objection.
 {¶ 41} THE COURT: Why don't we approach now and resolve this issue. * * *
 {¶ 42} "Q. What had Mr. Anderson expressed to you that prompted you to call Detective Mizeres?
 {¶ 43} "A. He expressed fears of things that had happened at home.
 {¶ 44} "Q. Okay. Did he tell you who he was afraid of?
 {¶ 45} "A. Pretty much the whole family, just out of different things that had happened.
* * *
"Q. What did, what did Dean tell you that caused him — let me rephrase this. You called Detective Mizeres?
 {¶ 46} "A. Correct.
 {¶ 47} "Q. And that was a result of conversation with Mr. Anderson?
 {¶ 48} "A. Correct.
 {¶ 49} "Q. And was that conversation, did that take place shortly before his death?
 {¶ 50} "A. Correct.
 {¶ 51} "Q. And did he tell you what — what did he say to you specifically about his family that prompted you to call Detective Mizeres?
 {¶ 52} "A. He told me exactly that he thought they were trying to kill him.
 {¶ 53} "Q. And as a result of that, when you learned of his death, you called Detective Mizeres?
 {¶ 54} "A. Correct.
 {¶ 55} Tr. Vol. II at 152-154.
 {¶ 56} Michele Kourouniotis, a bartender at Miller's Tavern who knew the decedent as a regular, testified:
 {¶ 57} "Q. Did you have an occasion to see Mr. Anderson on December 10 of the year 2002?
 {¶ 58} "A. December 10?
 {¶ 59} "Q. Yes.
 {¶ 60} "A. I forgot which day that is.
 {¶ 61} "Q. That would have been Wednesday.
 {¶ 62} "A. A Wednesday?
 {¶ 63} "Q. Yes.
 {¶ 64} "A. Yes.
 {¶ 65} "Q. Do you recall him being in the tavern that night?
 {¶ 66} "A. Yes.
* * *
 {¶ 67} "Q. Okay. When he left that bar, in your opinion was he intoxicated?
 {¶ 68} "A. No.
 {¶ 69} "Q. Okay. On December 11, did you receive news in regards to Ernest Dean Anderson?
 {¶ 70} "A. Yes.
 {¶ 71} "Q. Okay. What was the news that you received?
 {¶ 72} "A. That he died in a fire.
 {¶ 73} "Q. Now, on the twelfth of December, did you contact a Detective James Mizeres?
 {¶ 74} "A. Yes, I did. I went straight down to the police station.
 {¶ 75} "Q. Okay, did you talk to Detective Mizeres?
 {¶ 76} "A. Yes.
 {¶ 77} "Q. Why did you go see Detective Mizeres?
 {¶ 78} "A. Because Dean had told me —
 {¶ 79} "MR. MACKEY: Objection.
 {¶ 80} "THE COURT: Overruled.
 {¶ 81} "Q. Go ahead, you can answer.
 {¶ 82} "A. Dean had told me if anything happened to him to please have it investigated.
 {¶ 83} "Q. Okay. Who did he tell you he thought was trying to do something to him?
 {¶ 84} "A. His family.
 {¶ 85} "Q. Okay. What were they trying to do? What did Dean think they were trying to do?
 {¶ 86} "A. Trying to kill him."
 {¶ 87} Tr. Vol. II at 160-162.
 {¶ 88} We find no error in the trial court's admission of Welch's statements regarding the decedent's expressions of fear. However, we find admission of the reasons for the decedent's fearful state of mind error under Evid. R. 803(3) and State v.Apanovitch. Assuming Dean's statement to Kourouniotis expressed his fear, we likewise find the trial court should not have allowed Kourouniotis to state the reasons for Dean's fear. Nonetheless, we find such error to be harmless in light of the overwhelming evidence of appellant's guilt, most notably appellant's confession.
 {¶ 89} Appellant's first assignment of error is overruled.
 {¶ 90} The judgment of the Stark County Court of Common Pleas is affirmed.
Hoffman, J. Gwin, P.J. and Farmer, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.